SUNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. 24-CR-203 (NEB/DJF) |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | **DORIAN BARRS'** |
| | ) | **SENTENCING POSITION** |
| DORIAN CHRISTOPHER BARRS, | ) | |
| | ) | |
| Defendant. | ) | |

Dorian Barrs never matured. When he was arrested his apartment looked like a college dorm room. Dirty dishes in the sink. Takeout boxes in the refrigerator. His bedroom had two videogaming stations. He worked at a fitness center monitoring the basketball courts. Simply, he is immature. His immaturity does not excuse what he has done. But it is part of the context of a case that falls outside of the typical production case. His sentencing guidelines are off the chart. Regardless, he faces decades in prison. Real punishment. But like everyone who appears before this Court, Mr. Barrs is more than just a sentencing guideline recommendation. He is flawed and good at the same time. He must be punished and rehabilitated. And when the Court looks at the offense conduct and the man who is Mr. Barrs, a sentence of 20-years of prison will punish and leave room for that rehabilitation.

Since his arrest Mr. Barrs has had to face the consequences of his actions. His case has had several terms in the media ensuring a lifetime of identification as a sex offender. He has had to abandon any rationalization or denial that may have contributed to his behavior. While this case is about Mr. Barrs, this case is first about the people he has hurt.

1

In wrapping his mind around what he did and the consequences his actions have caused he has begun to understand the perspective of those he hurt. In these Court proceedings he has begun that process of taking responsibility. He waived his preliminary hearing. Agreed to detention. Reached a plea before filing motions. He agreed to sentencing enhancements for all the victims. Agreed to restitution. Agreed to argue for a sentence of 20-years. He has taken responsibility.

This is not to say that since being charged, Mr. Barrs has not struggled to understand why he did what he did. Recognizing the wrong has been easy, understanding the why is more difficult. But he knows that moving forward there is no option but to confront the why. He knows that only when he confronts the why, can he begin to move forward. He is realistic that his future will be in custody, but he maintains hope that someday he will contribute to his community. Since being incarcerated, he has experienced loneliness, depression, and shame. He places the blame for what he did nowhere else but on his own shoulders. And in that process, he has kindled a hope for his future.

**I.      Mr. Barrs' Objections to the PSR.**

Mr. Barrs has objected to the sentencing guideline calculations where they differ from those contemplated in the plea agreement. The objections are somewhat academic, as the contemplated guidelines from his plea agreement are also life. Nevertheless, Counsel, for the record maintains the objections. Mr. Barrs simply wants the Court to know he accepts responsibility no matter how the guidelines are calculated.

**II.  A 20-year sentence accomplishes the goals of sentencing.**

Considering the 18 U.S.C. § 3553(a) factors—including the nature and circumstances of the offense; Mr. Barrs' history and characteristics; the need for the sentence to reflect just punishment, deterrence, and public safety; and avoiding unwarranted disparities—a 20-year sentence is "sufficient, but not greater than necessary, to" achieve the purposes of sentencing. 18 U.S.C. § 3553(a).

**A.  Mr. Barrs' history and characteristics and the offense**

<u>Early Childhood & Family History</u>

Mr. Barrs' parents were never married but co-parented him along with his seven siblings.  He described a positive childhood in his PSR interview.  But he also noted that he observed his parents argue and his father strike his mother on at least one occasion.  His father also regularly used marijuana and other substances.  His father's drug use led to federal charges and his father was arrested when Mr. Barrs was 11.  His father was incarcerated until Mr. Barrs graduated high school.  While initially he had some contact with his father at the start of his father's incarceration, contact ceased once his parents separated.  As a single mom, his mother worked long hours to provide for the family and while his basic needs were met, he often did not have an adult influence in his life.  While his father was in prison, his mother met another man, who Mr. Barrs' reported was a positive influence in his life.  Even after his mother ended this relationship, Mr. Barrs tried to remain in contact with him.  But with time this relationship ended as well.

Mr. Barrs was raised in a small town and was exposed to drug use and occasional

violence in the community. He reported seeing stabbings, shootings, and he knows people who have been victims of physical assault and sexual violence. Of his childhood, he also recalled times of being called racial slurs and he remembers seeing the Confederate flag flown in town and learning what it meant. Mr. Barrs shared with me that his family often spoke in demeaning ways to each other. One example he gave is that his father's name is also "Dorian", and the name would be invoked as he was told he would not amount to anything. He also believes his father's criminal record resulted in preconceived notions by teachers and community members that impacted him growing up.

Mr. Barrs reports that he was sexually abused around the age of 8 by an older female family member. It was his first exposure to sex. He never told anyone, and when asked about the incident, he stated that he does not believe it has impacted him. When pushed on this he agreed he should probably talk to a counselor about it and was open to understanding what impact things like this may have had on his current decision making. During this conversation he also noted that he probably still needs to "deal" with his sister's depression and attempted suicide while he was away at college, and "other" things.

Leading Up to Offense

After high school, Mr. Barrs moved to Tennessee to attend college and play basketball. He frequently referenced this as a "ghetto black story" as he does not believe he would have attended college if he had not played sports. After his first year he moved to Orlando and then Lake Wales, Florida to play sports and attend school. This only lasted for an additional year before he moved to Littleton, Colorado and then ultimately Minnetonka, Minnesota in

2015. When asked about his various moves across the country, he stated that he frequently moved for girlfriends.

During college he reported he attended classes, but was also focused more on playing basketball and on having fun and partying.

Mr. Barrs' many relationships with women have been a significant part of his life. His first real girlfriend was when he was 18, she was 22. They were together for approximately three years. They met while he attended college in Tennessee. They chose to move to Orlando and after this move, she reconnected with an ex-boyfriend which ended their relationship. He was unprepared for the hurt he felt. He played basketball at a college in Lake Wales, where he was paid to play. While there, his grades fluctuated as he was more focused on partying. Teachers and coaches alike reached out to assist him, but he declined the help. During his time there he met and began to date his next real girlfriend. While dating she moved home to Colorado, and he followed. After the move he worked and snowboarded and began to play volleyball, unfortunately he never returned to school. After being together for about four years, she began to date a co-worker. He described that again he was "heartbroken." Since they lived together, he moved out and "couch surfed" and also lived in his vehicle.

While still in Colorado, Mr. Barrs met the mother of his son while playing volleyball. They were together for about four years. When she graduated from college in Colorado, she moved to Minnesota. He followed her. Their son was born in 2018. Their relationship ended after she believed he was unfaithful. They continued to live together, but she slept on

the couch. It was during this time he met a younger woman. She was 18 and he was about 25. They dated for a year, but he explained that they were better at being best friends, who also were sometimes sexual. Their relationship ended in 2023, as this case became public. During this relationship, he met another woman his own age who he was with when the charges in this case came. She coached volleyball with him and went to medical school. It was during this relationship the charged offenses occurred.

The Offense

In 2020, Mr. Barrs met one of the victims of the offense. Similar to his descriptions of all of the victims, he indicated they had great conversations and she was driven and articulate. She was 17 at the time. (I observed this was a common theme when Mr. Barrs spoke about the victims. He talked about all the victims with varying degrees of admiration). In talking about the relationship today, he commented that he did not see her as a 17-year-old and reported he was oblivious to her young age even though he was 28. Looking back, he is ashamed and knows that given his age he had a responsibility to be mature. He sees this now as a personal failure. It was during this time, he started having relationships with multiple women. He kept it a secret because he did not want to "hurt them" which he identified as complicated. In reference to another victim, he recalled an instance when she asked him if they were exclusively dating, and he said "yes." Something that was a lie. He described living in a world of lies. Sometimes he would look at himself in disbelief, but felt like he could not change things. He felt his life was out of control and the only solution was to just keep going. He believed that something would happen to provide a solution. He now knows

he was living in denial and rationalizing his behavior to justify his own selfish desires. He knows he was immature. That he had become selfish and entirely self-centered. When reflecting on these past "relationships," Mr. Barrs said they, were loyal to him and made him feel loved. And he betrayed those feelings for his own selfish wants. He has started to see his behavior was manipulative and selfish. As I listen to him and have heard him attempt to make sense of what he did, it seems clear that his sexualization of his relationships with these young women was an attempt to make connections that would last. While there is no complete or simple answer to why, clearly a combination of factors impacted Mr. Barrs. A lack of impulse control, immaturity, selfishness, and a longing for a permanent connection played a role. Today his insights and struggle seem genuine.

<u>Following the Offense</u>

Mr. Barrs has been at the Sherburne County Jail since July 31, 2024. His days are spent working out, playing basketball, reading, researching case law, and going to mental health classes. The time and the mental health classes have made him think about how his decisions and behavior have affected other people. He sees now that he has hurt the way they view love and authority figures. He understands that his actions have likely made it hard for his victims to trust the opposite sex or older people who want to help. He has also learned that he is impulsive. He recognizes that his past behavior, like buying an expensive pair of shoes for himself and his son when the money was needed for other things was irresponsible. Just one of the many irresponsible and selfish things he did. He also sees that moving from school to school and to three different states for three different women was not normal. And

most importantly, that what he did to the victims in this case impacted real people who will now have real trauma because of his impulsive unjustified behavior.

He was asked recently in one of the classes what has caused problems in his life. He identified unreasonable emotions tied up in being a black male and not wanting to be seen as weak or gay. He thinks not having a father around and learning to be a man from friends in high school, where the talk was all about sex and sports and being a good athlete and impressing girls. He also admits that there are likely many other reasons. He is committed to working on finding those reasons. And once he has faced those motivations that influenced his behavior he knows he will then need to learn how to build healthy relationships.

Today his mother is his primary support. While she is aware of his charges, he has not told her the specific details. He is afraid of how she will respond—undoubtedly he is afraid of being abandoned. They speak two to three times per week via video visits. Of his seven siblings, he identified being close with three, and two being "sorta close," and one who is more independent. Otherwise, he is alone. During this time, he tells me he has thought a lot about the people he hurt. About what a distant future might look like. The whys. And a bit of hope.

While at Sherburne County Jail, Mr. Barrs participated in a mental health assessment on September 27, 2024. He was diagnosed with Adjustment Disorder with Anxiety. He was prescribed hydroxyzine HCL. He has begun his rehabilitation the best he can. He has engaged in mental health services via group/psychoeducation classes and weekly classes.

Mr. Barrs reports the classes have been helpful. He knows he still has much to learn. He has asked me many times about what mental health services will be available at the BOP. This engagement stands in stark contrast to when I first met with Mr. Barrs. Then he did not understand the enormity of the trouble he was in. Clearly in the beginning the length of incarceration he was facing seemed incomprehensible. Today he has accepted it. He knows he needs to "reform" himself. Something he believes he can do.

The conversations I have had with Mr. Barrs all leave an impression of a lost man. A man who grew up surrounded by people but lonely. Searching for connections that lasted and not finding many. It obviously takes two to make a relationship work, unfortunately for Mr. Barrs he has not found great success in lasting relationships. He knows he has role in that failure. While not a complete answer and certainly not a justification for what he did, his own insight into his longing to have a father and a connection with someone who loves him unconditionally is likely right on. Unfortunately, that need to connect intersected with the other reality of this case, that social media and the internet have drastically altered not just the culture and habits for young people, but sexual behavior. These changes have cultivated climates which allow for new forms of sexual exploitation and harm that vary dramatically from the longstanding profile of child pornography offenders and their conduct. Again, while all of this does not excuse the offense in this case, there is no doubt that Mr. Barrs' offense is wrapped up in this current intersection of technology and human behavior.

The role of the internet and social media cannot be overstated when evaluating how social and sexual norms have changed for young people in the past decade. These changes

began with the explosion of online pornography. Since pornography has become readily available online, young people are viewing it at earlier ages and in greater volumes. Past studies have found that, on average, a child in the United States sees online pornography for the first time at age 11. Shireen Bernstein et al., *Mind the Gap: Internet Pornography Exposure, Influence and Problematic Viewing Amongst Emerging Adults*, 20 Sexuality Research and Social Policy 599, 606 (2022). One widespread consequence is that online pornography consumption has become a recognized part of popular culture, rather than a clandestine habit of a troubled few. *Id.* at 609.

Adolescent and early adult men are the primary demographics consuming internet pornography. Michal Privara & Petr Bob, *Pornography Consumption and Cognitive-Affective Distress*, 211 Journal of Nervous and Mental Disease 641, 641 (2023). Studies have shown that increased pornography consumption is linked with compulsive sexual behavior, lower levels of sexual wellbeing, and feelings of insecurity. *Id.* at 642. Evidence also suggests that pornography is used as a coping mechanism that young men turn to in times of stress, depression, or anxiety. *Id.* at 641-42. When consumed during adolescence, it is linked with negative or unhealthy sexual development. *Id.* at 641.

While the internet has greatly accelerated the distribution and accessibility of pornography in general, social media has played a unique role—specifically for younger people. The emergence of digital sexual content and conduct has shaped the sexual and social development of teenagers and emerging adults. Online sexual exploration has become a new norm, but it has also created a new set of sexual risks. These risks range

from developmentally appropriate to abusive and dangerous. Ashwaq Alsoubai et al., *From 'Friends with Benefits' to 'Sextortion:' A Nuanced Investigation of Adolescents' Online Sexual Risk Experiences*, 6 Proc. ACM Hum.-Comput. Interact., 411, 411 (2022). These risks are commonly present when young people engage in the behavior of "sexting," which is the sharing of sexually explicit photos, videos, or messages through a social media platform, email, or text message. This environment is further cultivated by the seemingly impermanent nature of social media, which lends itself to the belief that online engagement is less risky.

Technological advances have also greatly changed the reality of cases like this. The United States Sentencing Commission has noted that the expansion of digital and mobile technology has contributed to a 422 percent increase in the number of production offenders. *Federal Sentencing of Child Pornography Production Cases*, U.S.S.C. October 2021. The ability of a cellphone to record and transmit photographs and videos has eliminated any technical hurdle to the production of child pornography. The ease of production coupled with the current trend of sharing every moment of life on social media has undoubtedly lowered inhibitions about what to record. The use of social media and the internet contributed to Mr. Barrs' behavior in this case. He recognizes that it does not excuse his behavior. But the intersection of social media and sexuality is a reality that this Court must take into account. The powerful external influences of social media do impact decision making today. Certainly, social media played a role in Mr. Barrs' behavior. Just as addiction and past experiences influence a person's decisions and are routinely taken

into account by courts when determining an appropriate sentence, social media can also exact a strong influence on decision making. For Mr. Barrs, social media influences and the technology of a smart phone converged and impacted his decision making. Decisions he will forever regret.

### B. Punishment, deterrence, and avoiding unwarranted disparities in light of the nature and circumstances of the offense

A 20-year sentence adequately punishes and deters Mr. Barrs, and it avoids unwarranted disparities in sentencing. Recent sentences imposed in other child pornography cases involving similar and more culpable conduct in the District of Minnesota confirm that a 20-year sentence is sufficient but not greater than necessary to achieve the societal aims of sentencing in this case. For example,

- Jason Lee pled guilty to one count of attempted production and production of child pornography and was sentenced to 180 months concurrent with the time he would serve on a Wisconsin state case in case 23-cr-128 (DWF). (23-cr-128 Doc. 44 at 2). He admitted to recording himself touching a 4-year-old's vagina with his hand. (23-cr-128 Doc. 27 at 2). Lee's guideline range was 168-210 months. (23-cr-128 Doc. 27 at 2, 5-6).

- Rachel Ann Raab pled guilty to one count of aiding and abetting production of child pornography and was sentenced to 180 months in case 22-cr-101 (KMM). (22-cr-101 Doc. 90 at 1-2). The minor victim, with whom Raab had a caretaking relationship, was under the age of 12, and the video showed Raab's hand rubbing lotion onto the victim's penis. Raab also distributed the video. (22-cr-101 Doc. 52 at 2, 5-6). Raab's guideline range was 262-327 months. (22-cr-101 Doc. 52 at 6).

- Gene Schave was convicted after trial of possessing child pornography and was sentenced to 150 months in case 20-cr-59 (ECT). (20-cr-59 Doc. 138 at 1-2). He had previously been convicted of a state sex offense, and while on probation for that offense, he admitted to sexually molesting seven minor girls. (20-cr-59 Doc. 125 at 2-4).

- David Barrett pled guilty to one count of attempted production of child pornography and was sentenced to 240 months in case 21-cr-39 (NEB). (21-cr-39 Doc. 52 at 1-2). He installed a hidden camera in a bathroom of his residence that he knew three minors would be using, and from 2017-2018, he captured naked images of all three of them. (21-cr-39 Doc. 27 at 6). Barrett also possessed an extensive collection of child pornography that involved children under the age of five being sexually assaulted, and he personally provided one of the minor victims of his production with alcohol and sexually assaulted her. Barrett's guideline range was 235-293 months. (21-cr-39 Doc. 27 at 6).

Similarly, sentences imposed in child pornography cases nationwide in the last five years show that a 20-year sentence would be sufficient but not greater than necessary in this case. For example:

- David Gfeller pled guilty to one count of production of child pornography and was sentenced to 180 months in case 19-cr-6205 in the Western District of New York. (Case Doc. 36 at 1-2). For more than two and a half years, he used a minor victim who was between 4 and 7 years old to produce and distributed child pornography, including Gfeller manipulating the minor's penis and then taking photos. (Case Doc. 22 at 4-5). His guideline range was 360-life. (Case Doc. 22 at 6-7).

- Jessica Barrington pled guilty to one count of production of child pornography and was sentenced to 240 months in case 19-cr-127 in the Eastern District of Washington. (Case Doc. 152 at 1-2). She produced and distributed images of her minor daughters, including performing oral sex on a 3-year-old, and she sent the images she produced to approximately ten men she met online. (Case Doc. 135 at 8). Her guideline range was life. (Case Doc. 135 at 12).

- Kaleb Scott pled guilty to one count of production of child pornography and was sentenced to 252 months in case 22-cr-5256 in the Western District of Washington. (Case Doc. 44 at 1-2). He took and distributed pictures of himself touching an infant child in his care with his penis and of himself penetrating the buttocks of the same minor. (Case Doc. 26 at 5-6). His guideline range was life. (Case Doc. 38 at 3).

- Selina Duflo pled guilty to one count of child pornography and was sentenced to 240 months in case 21-cr-153 in the District of Oregon. (Case

13

Doc. 49 at 2). For more than a year, she sexually abused a 6-year-old in her care and distributed the videos of the abuse. (Case Doc. 42 at 3). Her guideline range was 360-life. (Case Doc. 41 at 3).

- John Holcomb pled guilty to one count of production of child pornography and was sentenced to 240 months in case 21-cr-75 in the Western District of Washington. (Case Doc. 116 at 1-2). He did not reach a plea agreement until after the government had already submitted its witness list and exhibit list for trial. (*See* Case Docs. 89, 90, and 95). For six years, Holcomb used a child he had access to to take produce child pornography, including images of him touching the minor victim's vagina and penetrating her vagina. (Case Doc. 95 at 6-7). His guideline range was life. (Case Doc. 111 at 2).

As these cases demonstrate, a below guidelines sentence of 20-years is appropriate in Mr. Barrs' case.

A term of 20-years in prison also sufficiently protects the public from Mr. Barrs. While he is incarcerated, he will be separated from society and receive therapy to address the cause of his behavior. Should he receive a 20-year sentence, Mr. Barrs will be nearly fifty years old when he is released from prison. When Mr. Barrs reaches that age his risk level of recidivism will begin to decline and continue to decline as he ages. Mr. Barrs is also an appropriate candidate to receive treatment in prison, treatment that will equip him with the resources he needs to combat his behavior and mental health problems. Moreover, he will continue to receive treatment after his release from prison. Going to prison for longer than 20-years is not going to address or aid in rehabilitation. His supervision will also protect the community. Keeping Mr. Barrs in custody past 20 years will only make his reintegration and ability to receive treatment more difficult. *See*, e.g., Bernstein, Robert & Seltzer, Tammy, *Criminalization of People with Mental Illnesses: The Role of Mental Health Courts in System Reform*, 7 U. of the District of Columbia L.R. 143,

144–45 ("health treatment in prison is rarely successful and usually not even adequate to combat the worsening of psychiatric conditions caused by incarceration itself."). With supervision after his release, he can have the support of a probation officer, mental health services, and sexual offender treatment.

    C.    **Fine and Special Assessments**

Mr. Barrs will not be able to pay a fine. He will not be able to pay the special assessments pursuant JVT Act of 2015 which requires the Court to assess a special assessment in the amount of $5,000 on any non-indigent person. The provisions of the AVA Act of 2018, require a special assessment in the amount of $50,000 but requires the Court to examine 3553(a) factors. To determine the amount of the assessment within the authorized range, AVAA instructs that a sentencing court "shall consider the factors set forth in sections 3553(a) and 3572." § 2259A(c). Mr. Barrs argues that neither special assessment should be applied.

Mr. Barrs is indigent and does not have the ability to pay the assessment now or in the future. He has limited work experience and he is not sure what type of employment he will have given his convictions. Respectfully, he requests that the $5,000 assessment not be imposed, the $50,000 assessment not be applied, and no fine be imposed. He has agreed to make restitution to the individual victims and any restitution ordered should be directly related to the victims. Further, it will be important for Mr. Barrs to concentrate on his treatment rather than being drowned in debt when he is released. Again, he understands he will have to pay the agreed to restitution.

### D.     Length of Term of Supervision

With respect to the length of supervised release, the applicable supervised release-authorization statute is 18 U.S.C. § 3583(k), which permits an initial supervised release term of "any term of years not less than 5, or life." The length of supervised release term within those parameters is governed by § 3583(c), which in turn references *most* of the sentencing factors contained in § 3553(a). A lifetime supervised release term is extreme and not warranted here. Supervision is meant to serve rehabilitative ends and smooth the transition from prison to free society, not to heap additional punishment after a prison term ends. "Still, supervised release is itself a serious sanction that imposes significant limitations on a defendant's liberty." *United States v. Brooks,* 889 F.3d 95, 101 (2d Cir. 2018). A lifetime supervised release term "is an extreme and unusual remedy." *Id.*; *see also United States v. Asalati,* 615 F.3d 1001, 1007 (8th Cir. 2010) (describing lifetime SR term as "harsh" sanction). This is confirmed by data from the United States Sentencing Commission. *See,* USSC, *Federal Probation and Supervised Release Violations*, at 49 n.127 (July 2020) ("A very small proportion of supervision violators (0.7%) and offenders at original sentencing (1.2%) were sentenced to supervision terms of life.").

"A lifetime of supervised release is also, to some degree, at odds with the rehabilitative purpose of supervised release, as it presumes that the need for supervision will never end and that the defendant is essentially incorrigible." *Brooks,* 889 F.3d at 101. Hence, the decision to impose such an "extreme," "unusual" and "harsh" sanction must be taken with great care, taking account of all the relevant § 3583(c) factors and total picture

of the defendant's individual circumstances and background. *See id.* Mr. Barrs asks the Court to set a reasonable set time period for supervision.

  **E.**  **Restitution**

The provisions of the Mandatory Victim Restitution Act of 1996 apply to this offense. Again, Mr. Barrs has agreed to restitution; Counsel's only request is that interest be waived.

## CONCLUSION

In light of the circumstances of the offense, Mr. Barrs' acceptance of responsibility, his history and characteristics, and the sentences imposed in both similar and longer running child pornography offenses in the District of Minnesota and nationwide, he requests that the Court impose a sentence of 20-years. He is a young man who recognizes his actions hurt others. He also knows that his actions can never be repeated. Mr. Barrs makes a vow to this Court that he will do whatever it takes to make sure he does not hurt anyone ever again.

Dated: April 17, 2025.       Respectfully submitted,

                 *s/ Aaron Morrison*

                 AARON MORRISON
                 Attorney ID No. 0341241
                 Attorney for Mr. Barrs
                 107 U.S. Courthouse
                 300 South Fourth Street
                 Minneapolis, MN 55415